STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant,

v.

Brenda A. WILSON, in her capacity as Special Administrator of the Estate of William D. Wilson, Appellee.

No. S–12779.

Supreme Court of Alaska.

Dec. 31, 2008.

David S. Carter, Hughes, Pfiffner, Gorski, Seedorf & Odsen, LLC, Anchorage, for Appellant.

Howard J. Meyer, Jr., Michael W. Flanigan, Walther & Flanigan, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

At issue in this case is the application of a statute that provides that underinsured motorist (UIM) coverage is excess to and may not duplicate payments made under liability or medical payment policies or workers' compensation benefits. The statute, AS 28.20.445(b), provides:

An amount payable under the uninsured and underinsured motorist coverage shall be excess to an amount payable under automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits and may not duplicate amounts paid or payable under valid and collectible automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits.

## Facts

William Wilson was injured in an automobile accident while in the course of his employment with Austin Industrial Company. At the time of the accident Wilson was a passenger in an automobile driven by Lisa Grubb. Grubb was also an employee of Austin and was also on the job when the accident occurred. Grubb lost control of her vehicle and crashed while attempting to avoid a head-on collision with an automobile driven by Jo Lynn Sauve. Sauve had driven into Grubb's lane of travel to avoid hitting a moose.

A subsequent arbitration proceeding determined that Wilson suffered $210,000 in damages, consisting of lost wages of $75,000 and general damages of $135,000. The arbitrators also determined that Sauve bore responsibility for sixty percent of the total fault of the accident. Grubb's responsibility was forty percent of the total fault. These damages and percentages are accepted as controlling for the purposes of this case.

Prior to the arbitration, Wilson sued Sauve. Sauve had liability insurance of $50,000. Wilson settled with Sauve for this amount plus interest, fees, and costs. Wilson could not sue Grubb because as a co-employee she had the same immunity from suit as their mutual employer, Austin.[1] As a trade-off for its immunity from suit, Austin, through its workers' compensation insurer, was responsible for the payment of workers' compensa-

tion benefits. Austin discharged this responsibility by paying Wilson $52,000 in benefits.[2] It is undisputed that at least $44,000 of this sum was for lost wages. The remaining $8,000 was for an unallocated mix of anticipated future losses, including lost wages.

Grubb had three personal automobile policies issued by State Farm. Each had UIM provisions with limits of $50,000. These provisions covered Wilson as an additional insured because he was occupying a vehicle driven by Grubb at the time of the accident. Under the UIM provisions, State Farm agreed to pay an insured, such as Wilson, damages for injuries the insured would be entitled to collect from the driver of an underinsured vehicle, such as Sauve.

Wilson, as might be expected, claimed that Sauve was underinsured and sought damages from State Farm. Sauve's liability and Wilson's damages were disputed. These disputes were arbitrated. The arbitrators decided, as indicated above, that Sauve was sixty percent responsible for the accident and that Wilson suffered lost wages of $75,000 and general damages of $135,000, for total damages of $210,000.[3]

After the arbitration decision, Wilson's personal representative[4] (Wilson) and State Farm disagreed with respect to how the prior payment of $50,000 made by Sauve's insurer and the $52,000 in workers' compensation benefits should be handled in light of AS 28.20.445(b). Wilson contended that State Farm should pay $76,000.[5] She reasoned that Sauve's liability was $126,000 (sixty percent of the total damages of $210,000). From this she would have deducted the $50,000 paid by Sauve's insurer, leaving $76,000 due from State Farm under its UIM policies.

State Farm initially contended that it should pay $31,000, but later decided to pay $54,000. It argued that the lost wage and

---

1. AS 23.30.055.

2. All figures used in this opinion have been rounded to the nearest thousand.

3. Medical expenses were not submitted as part of Wilson's claim.

4. William Wilson died while arbitration was pending, and his widow, Brenda Wilson, continued to maintain his claim on behalf of his estate.

5. This and all amounts hereafter mentioned are principal sums. Wilson also sought add-ons of interest, fees, and costs.

general damage components of Wilson's damages should be treated separately.

At first State Farm contended that Sauve's liability before deductions should be $45,000 for past wage loss (sixty percent of $75,000) plus $81,000 for general damages (sixty percent of $135,000). State Farm contended that the $50,000 paid by Sauve's insurer should be deducted from $81,000, leaving $31,000 to be paid under the UIM policies as general damages. As to lost wages, State Farm initially contended that the $52,000 received as workers' compensation benefits should be deducted from the amount of lost wages that would otherwise be owed by Sauve ($45,000) resulting in a negative amount and therefore leaving nothing owed by State Farm for lost wages.

Later State Farm decided to pay $23,000 for lost wages. It arrived at this amount by deducting from Wilson's total wage loss ($75,000) the compensation benefits he had received ($52,000) without making any reduction for the fact that Sauve was only sixty percent at fault. Thus State Farm ultimately agreed to pay, and paid, $31,000 for general damages and $23,000 for lost wages, for a total of $54,000.[6]

## Proceedings

Wilson filed suit against State Farm seeking to enforce the arbitration award with a deduction only for the $50,000 paid by Sauve's insurer. After State Farm answered it moved for summary judgment, claiming that it owed nothing in addition to the payments it had already made. Wilson opposed State Farm's motion and moved for summary judgment on her claim. After further replies by both parties, the superior court granted Wilson's motion and denied State Farm's. The court stated:

> Pursuant to Alaska's laws applicable to interpretation of insurance policies, the UIM coverage under the applicable State Farm policy provides for plaintiff to recover 100% of the damages allocated to the underinsured driver by the Arbitration Panel in this matter. From that

sum should then be deducted the policy limits under the tortfeasors liability policy without any further reduction for amounts received by Mr. Wilson in workers' compensation benefits, where as here, the reduction of Wilson's damages attributable to the fault of his employer exceeds the amount of workers' compensation benefits that he received.

Further, this result is consistent with AS 09.17.080(c), AS 23.30.015(g) and AS 28.20.445(b), when those statutes are harmonized.

The court denied State Farm's request for reconsideration, and State Farm now appeals.

## Contentions on Appeal

State Farm's general position on appeal is that the position it ultimately took following the arbitration award that is described above is legally correct. In particular, it argues that the general damage and lost wage components of the arbitrators' decision should be treated separately. As to general damages, it would reduce the award of $135,000 to $81,000 to reflect Sauve's sixty percent share of fault, and then deduct $50,000 to reflect the payment made by Sauve's insurer, leaving $31,000 due under the UIM policies. As to lost wages, State Farm would not reduce the amount of $75,000 to reflect Sauve's share of fault, but would deduct the compensation benefits of $52,000 from $75,000, leaving $23,000 due from State Farm. State Farm contends that Wilson is attempting to double recover $22,000 in lost wages—the difference between the $76,000 that Wilson claims was due and the $54,000 that State Farm paid. State Farm claims that the $22,000 in dispute is prohibited by the "excess to" and "may not duplicate" language of AS 28.20.445(b).

Wilson contends that the damages she recovered should not be "parsed." She notes that the language of subsection .445(b), and the State Farm policies, refer only to "amount" or "amounts" payable or paid,

---

6. Just as Wilson ignored medical expenses when presenting his damages at the arbitration, State Farm ignored the workers' compensation insurer's payment of Wilson's medical expenses when determining the amount owed to Wilson.

rather than to "elements of loss" as do some policies with similar purposes. Her basic contention is that the amount of damages that were reduced because of Grubb's fault—for which Austin is responsible under respondeat superior principles—should be compared with the benefits paid by Austin. Because the benefits do not exceed the reductions, there is no duplication of benefits and no adjustments are called for under subsection .445(b).[7]

As noted earlier Wilson did not seek medical expense damages at the arbitration. State Farm does not argue that it is entitled to a credit for the workers' compensation insurer's payment of Wilson's medical expenses. The parties' reciprocal conduct reflects at least an implicit agreement that the workers' compensation insurer's payment of Wilson's medical expenses extinguished that aspect of Wilson's claim without impact on the current dispute. We will follow the parties' convention and ignore whether or how Wilson's medical expenses and the workers' compensation insurer's payment of those expenses might affect our resolution of the parties' dispute.

## Discussion

### Purposes of UIM Coverage—Alaska Statutes and Cases

■ The idea underlying underinsured motorist coverage is that the insured pur-

chases coverage to benefit herself in case she is injured by a motorist whose liability insurance is insufficient to cover her injuries. UIM coverage thus is meant to stand as supplemental liability insurance covering an underinsured motorist for the benefit of the insured: "The basic public policy behind mandatory uninsured or underinsured motorist schemes in various states is generally to ensure that the insured recovers the damages he or she would have been able to recover if the insured motorist had maintained a (sufficient) policy of liability insurance."[8]

Although UIM coverage seems simple in concept, a number of difficulties in application have arisen. Initially, our statutes permitted a definition of "underinsured motor vehicle" that compared the liability coverage for the vehicle in question with the UIM limits available to the insured, rather than with her total damages.[9] Further, under the former statutory system, it was thought that amounts paid from other sources could be deducted from UIM limits, regardless of the damages suffered by an insured.[10] In 1990 the statutes were amended, changing this so-called "reduction" system to one in which UIM coverage *adds* to available coverage from other sources.[11]

The new statutory system, referred to as an "excess" approach, still sought to ensure

7. Wilson also makes some very complicated arguments concerning the interaction of amendments to AS 09.17.080(c) and AS 23.30.015(g), passed in 1997 (relating to reducing an employer's third-party claim by the employer's share of fault), with subsection .445(b). Insofar as these arguments suggest that the 1997 amendments changed the meaning of subsection .445(b), which was enacted in 1990, they are rejected.

8. 12 COUCH ON INSURANCE § 171:2, at 171–7 (2006).

9. Former AS 28.20.445(h) defined "underinsured motor vehicle" as a vehicle with liability coverage for bodily injury in an amount that

(1) is less than the limit for ... underinsured motorists coverage under the insured's policy; or
(2) has been reduced by payments to persons other than an insured, injured in an accident, to less than the limit for ... underinsured motorists coverage under the insured's policy.

*See Progressive Ins. Co. v. Simmons*, 953 P.2d 510, 513 (Alaska 1998).

10. *Id.* at 514. *But see Victor v. State Farm Fire & Cas. Co.*, 908 P.2d 1043 (Alaska 1996), discussed *infra* p. 585.

11. *Simmons*, 953 P.2d at 514. In *Simmons* we quoted the following example given by Representative Donley, the chief sponsor of the 1990 amendments:

[T]he bill is aimed at underinsured or uninsured automobile insurance. The consumer thinks they are buying a certain amount of insurance coverage, for example $100,000. In fact, what they are buying is protection up to $100,000. If they were hit by someone with $25,000 insurance, their own insurance company would only pay $75,000. Most people don't realize this when they purchase insurance. [The bill] is an attempt to better compensate consumers for their actual damages. *Id.*

that UIM coverage was secondary to other sources of coverage and that it not be available to make duplicative payments. This may be seen by comparing the new version of AS 28.20.445(b) with the subsection it replaced. The current version of AS 28.20.445(b) provides:

> An amount payable under the uninsured and underinsured motorist coverage *shall be excess* to an amount payable under automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits *and may not duplicate amounts* paid or payable under valid and collectible automobile bodily injury, death, or medical payments coverage, or as workers' compensation benefits.

(Emphasis added.) Subsection .445(b) formerly provided, in accordance with the reduction approach:

> Amounts payable under the uninsured motorists and underinsured motorists coverage *may be reduced by*
>
> (1) amounts paid or to be paid under any workers' compensation law;
>
> (2) amounts paid or payable under valid and collectible automobile medical payments insurance or bodily injury or death liability insurance; and
>
> (3) amounts paid by or on behalf of the uninsured or underinsured motorist.

(Emphasis added.) Reflecting in part the shift in statutory purpose from a reduction approach to an excess approach, the UIM policies in this case contain clauses that may reflect both approaches.[12]

In *Victor v. State Farm Fire & Casualty Co.*[13] we were presented with the question of whether a reduction clause, which was nearly identical to the clause in the current policies

quoted in note 12, required a reduction from policy limits or from the total damages suffered by the insured. We held that the phrase "any amount payable" referred to the total damages suffered by the insured rather than to the policy limits. We reasoned that the "underlying purpose of reduction clauses . . . is to prevent double recoveries" and that "[t]his purpose is furthered by our interpretation" of the reduction clause and "would not be furthered by an interpretation requiring a reduction from policy limits where total damages exceed policy limits."[14]

In *Curran v. Progressive Northwestern Insurance Co.*[15] we summarized the purpose of UIM coverage under the current system in contrast to the former reduction approach:

> In 1990 the legislature changed Alaska's UIM statutes from a reduction approach to an excess approach. Under the reduction approach, UIM coverage protected an insured person only to the extent that the UIM limits exceeded the limits of available liability coverage. This approach attempted to "put the insured in the same position he or she would have occupied had the tortfeasor's liability insurance limits been the same as the underinsured motorist coverage limits purchased by the insured." It reduced an insured's amount of UIM protection by "subtracting from the UIM policy limits any amount paid or payable to the insured from other sources, including liability coverage."
>
> In contrast, under Alaska's current excess approach, "an underinsured driver is one whose liability limits are insufficient to cover the injured person's actual damages." Under this approach, UIM coverage
>
> shall not duplicate any amounts paid or payable to or for the *insured* under:
> a. the liability coverage;
> b. the medical payments coverage;
> c. the death, dismemberment and loss of sight coverage;
> d. any workers' compensation law.

---

12. The following clause, applicable only to uninsured, not underinsured, motor vehicles, appears to take a reduction approach:

> 2. If the damages are caused by an *uninsured motor vehicle,* any amount payable under this coverage shall be reduced by any amount paid or payable to or for the *insured* by or for any *person* or organization who is or may be held legally liable for *bodily injury* to the *insured.*

The excess approach is reflected by a clause that is similar to current AS 28.20.445(b):

> 1. Any amount payable under these coverages for *bodily injury* shall be excess over and

13. 908 P.2d 1043 (Alaska 1996).

14. *Id.* at 1046.

15. 29 P.3d 829, 832 (Alaska 2001).

is premised upon the idea that the injured person is entitled to recover under his or her own underinsured motorist coverage to the extent that the tortfeasor's liability insurance coverage is insufficient to compensate the injured person fully for his or her loss, subject only to the limits of the underinsured motorist coverage.

Excess coverage thus strives to provide additional coverage, as needed to fully compensate injured motorists, after available liability coverage has been completely exhausted.[16]

## The Intuitive Result

In light of the purposes of Alaska's UIM system, how should this case be decided? This question lends itself to an intuitive answer that can serve as a check on the more detailed explanation that we offer later in this opinion.

Wilson has received $102,000. The UIM policies stand for additional liability insurance for Sauve of $150,000. Sauve, according to the arbitrators, is liable for $126,000 (.6 × $210,000). Because Sauve has already paid $50,000, which she should get credit for (the liability policy settlement), she should be liable for another $76,000. This is the amount that should be due under the UIM policies, which conceptually provide additional liability insurance for Sauve that Wilson, as an insured, may draw upon.

Requiring State Farm to pay another $76,000 under its UIM policies is not a double recovery for Wilson. Wilson will receive $50,000 plus $76,000 due to Sauve's responsibility, and another $52,000 from his employer's workers' compensation insurer. This adds up to $178,000. Wilson will not be doubly compensated because his loss was $210,000.

## Subsection .445(b) Considered—Aggregate Damages

Alaska Statute 28.20.445(b) contains two imperatives. UIM payments are to be excess to the other benefits specified in the statute and may not duplicate the other benefits. "Excess" in this context seems to mean that benefits "payable" from the other sources designated in the statute must be taken into account when calculating the amount due under UIM coverage.[17] The requirement that UIM payments may not duplicate other benefits "paid or payable" seems to be a mandate that UIM coverage may not be called upon to pay for damages that have been or will be fully paid for from the other designated sources.

These concepts should be easy enough to apply in cases where the underinsured motorist is the only tortfeasor and he is fully responsible for the accident. But complexities arise when there are two tortfeasors who share responsibility for the accident, and one is underinsured and the other settles with the insured. Moreover, additional complexities are at least potentially present where, as here, one of the tortfeasors is immune from liability under the Workers' Compensation Act. In the discussion that follows, we assume that compensatory damages are treated in the aggregate rather than separately—separate treatment would add a further complexity, and we conclude in a later section of this opinion that it is not required. We also assume that only the anti-duplication requirement of .445(b) is involved because the parties do not suggest that benefits from any of the other sources designated in the statute remain payable.

## How We Determine a Duplicate Recovery.

Under subsection .445(b) automobile bodily injury coverage and workers' compensation

16. *Id.* (citations omitted) (quoting *Simmons,* 953 P.2d at 514, 517 n. 6).

17. "Excess coverage ... strives to provide additional coverage, as needed to fully compensate injured motorists, after available liability coverage has been completely exhausted." *Curran,* 29 P.3d at 832. We recently re-affirmed this understanding of UIM coverage in *Sidney v. Allstate Ins. Co.,* 187 P.3d 443 (Alaska 2008), citing the above explanation from *Curran* to support our finding that "[i]t would be unreasonable to conclude that [the insured] incurred damages of $118,432, but that upon exhausting $50,000 policy limits she was entitled to a UIM award that failed to reflect her receipt of the underlying benefits. It would also run counter to Alaska's excess approach to UIM coverage." *Sidney,* 187 P.3d at 450.

benefits are parallel in the sense that UIM coverage may not duplicate amounts paid under either of these alternative sources of benefits. To simplify our analysis, it seems useful to consider how .445(b) would be applied if Wilson and Grubb were not in the course of their employment at the time of the accident, and Grubb settled with Wilson for $52,000 from her liability coverage before the arbitration decision. How should this $52,000 payment be treated, assuming that all the other facts are unchanged?

To determine if there is a duplicate recovery, it is useful to create separate columns for each of the tortfeasors and for the insured.[18] Each tortfeasor's share of the insured's damages should be entered at the top of each tortfeasor's column, and the insured's total damages should be entered at the top of her column. Then the credits that each tortfeasor is entitled to should be entered in the respective columns of each. Here the credits are $50,000 for the liability insurance settlement made for Sauve and $52,000 for the liability insurance settlement made for Grubb. In the insured's column the total of the credits should be entered. Then the credits should be subtracted from the damages figure in each column.

■ The result in the underinsured motorist's column is the amount due unless there is a double recovery. The result in the insured's column is the additional amount that she can receive without obtaining a double recovery. In our example the additional amount that the insured can receive without obtaining a double recovery is $108,000. Because this is greater than the amount tentatively due from the underinsured motorist, it can be readily seen that there is no double recovery. The result in the column of the settling tortfeasor is $32,000. Under our hypothetical this amount is irrelevant. Grubb would not be required to pay more; she has made what turned out for her to be a good settlement, and the settlement controls.

But consider what would happen if Grubb had settled with Wilson for $100,000 from her liability insurance and the facts were otherwise the same.[19] In this case the result in Grubb's underpayment column would be a negative—in other words, a $16,000 overpayment. The result in the insured's column would be $60,000. Because $60,000 is less

18. For ease of understanding, the three columns are set out here:

| | Underinsured Motorist (Sauve) | Settling Tortfeasor (Grubb) | Insured (Wilson) |
|---|---|---|---|
| Share of damages | $126,000 | $84,000 | Total damages $210,000 |
| Credits | liability insurance payment $50,000 | liability insurance payment $52,000 | Total credits $102,000 |
| Result: underpayment | tentative amount due $76,000 | $32,000 | Result: amount that can be received without double recovery $108,000 |

19. In that event, the three columns would look like this:

| | Underinsured Motorist (Sauve) | Settling Tortfeasor (Grubb) | Insured (Wilson) |
|---|---|---|---|
| Share of damages | $126,000 | $84,000 | Total damages $210,000 |
| Credits | liability insurance payment $50,000 | liability insurance payment $100,000 | Total credits $150,000 |
| Result: underpayment | tentative amount due $76,000 | −$16,000 | Result: amount that can be received without double recovery $60,000 |

than $76,000, Wilson may not receive more than an additional $60,000 from Sauve's UIM coverage without violating the double recovery prohibition of subsection .445(b). The negative $16,000 result in Grubb's column does not, of course, mean that her liability insurer is entitled to a $16,000 refund on the settlement. The settlement has turned out to be somewhat unfavorable from her liability insurer's standpoint, but again, it controls.[20]

This discussion confirms that there would be no duplicate recovery if Grubb's liability insurer, rather than her employer's workers' compensation carrier, made a $52,000 settlement with Wilson. The question becomes whether a different result should follow given that the actual $52,000 settlement consisted of workers' compensation benefits.

Workers' compensation insurers generally have a right to recover benefits that they have paid when an injured worker obtains a recovery in an action against a third party who is responsible for the worker's injury.[21] But if the employer is partly responsible for the injury, the amount that would otherwise be due the employer from the third-party action must be reduced by an amount equal to what the employer's share of damages would have been if the employer were not immune from suit.[22] Here the reduction would be $84,000, calculated by multiplying Wilson's total damages by Grubb's percentage of fault. Because this exceeds the $52,000 actually paid in workers' compensation benefits, no recovery would be available to Austin's workers' compensation carrier.

The result in this case is therefore exactly the same as in the hypothetical situation discussed earlier, in which we assumed that Grubb's liability insurer settled with Wilson for $52,000. This example verifies the accuracy of the superior court's observation that "where ... the reduction of Wilson's damages attributable to the fault of his employer exceeds the amount of workers' compensation benefits that he received," no reduction for workers' compensation benefits under subsection .445(b) is required.[23]

---

**20.** This method of calculating a duplicate recovery draws on the method suggested by Justice Eastaugh in his dissent in *Petrolane Inc. v. Robles,* 154 P.3d 1014, 1030–32 (Alaska 2007). The issue in *Petrolane* was whether a duplicate recovery was permissible under Alaska's several liability system when a plaintiff settles with one tortfeasor and later obtains a judgment against another, and where the amount of the settlement exceeds the settling tortfeasor's share of damages as ultimately determined by the verdict. The court held that a duplicate recovery was permissible and therefore had no occasion to explore how to calculate a duplicate recovery. Justice Eastaugh disagreed that a duplicate recovery should be allowed and explained how a duplication should be calculated. Our use of Justice Eastaugh's method does not indicate backtracking on the result in *Petrolane,* which this court unanimously reaffirmed in *Diggins v. Jackson,* 164 P.3d 647 (Alaska 2007). But the legislature in enacting subsection .445(b) has mandated that UIM coverage may not be used to make duplicate payments and thus a method for determining duplication is needed. For this purpose the court finds that an adaptation of the method suggested by Justice Eastaugh in his *Petrolane* dissent is appropriate.

**21.** *See* AS 23.30.015.

**22.** AS 23.30.015(g) provides:

If the employee or the employee's representative recovers damages from the third person, the employee or representative shall promptly pay to the employer the total amounts paid by the employer under (e)(1)(A)-(C) of this section insofar as the recovery is sufficient after deducting all litigation costs and expenses. Any excess recovery by the employee or representative shall be credited against any amount payable by the employer thereafter. If the employer is allocated a percentage of fault under AS 09.17.080, the amount due the employer under this subsection shall be reduced by an amount equal to the employer's equitable share of damages assessed under AS 09.17.080(c).

The underlined language was added by amendment in 1997. Ch. 26 § 36 SLA 1997.

**23.** What if the workers' compensation carrier had settled with Wilson for $100,000? After the $84,000 reduction required by AS 23.30.015(g), the carrier would be entitled to recover $16,000 from the proceeds of Wilson's third-party action against Sauve. Wilson's credits would thus be reduced from $150,000 to $134,000, and the maximum additional amount that Wilson could recover from the underinsured motorist without receiving a double recovery would be $76,000. Because this equals the tentative amount due in Sauve's column, $76,000 would be the amount payable under the UIM policies. The three columns would look like this:

| | Underinsured | Settling W/C |

## Should the Damage Elements Be Considered Separately?

The discussion so far assumes that the damage elements of Wilson's claim should be considered in the aggregate rather than separately. When they are considered in the aggregate, .445(b), as we have shown, is not violated. But when they are considered separately a different picture emerges.

If separate calculations are made for Wilson's wage loss and general damages under the method that we have used, and assuming that all of the $52,000 workers' compensation settlement was for wage loss and that all of the $50,000 paid by Sauve's insurance was for general damages, then the maximum additional amount that Wilson could receive for wage loss without receiving a double recovery would be $23,000.[24]

A second calculation would have to be made for general damages. The upshot of that calculation would be that although Wilson could receive an additional $85,000 for general damages without receiving a double recovery, he can actually receive only an additional $31,000 in UIM proceeds because Sauve's maximum liability for general damages is $81,000 and $50,000 on account of that liability that has already been paid.[25] The total additional amount Wilson could receive using separate calculations would be $54,000 ($23,000 + $31,000), in contrast to the total additional recovery of $76,000 when damage

| | Motorist (Sauve) | Insurer (Austin/Grubb) | Insured (Wilson) |
|---|---|---|---|
| Share of damages | $126,000 | $84,000 | $210,000 |
| Credits | liability insurance payment: $50,000 | W/C settlement $100,000 −$16,000 recovery from insured: $84,000 | $150,000 −$16,000 to W/C carrier: $134,000 |
| Result: underpayment | tentative amount due $76,000 | $0 | Result: amount that can be received without double recovery $76,000 |

24. The three-column calculations explaining this conclusion are set out below:

| Lost Wages | Underinsured Motorist (Sauve) | Settling W/C Insurer (Austin/Grubb) | Insured (Wilson) |
|---|---|---|---|
| Share of wage loss damages | $45,000 | $30,000 | $75,000 |
| Credits | no credits | $52,000 | $52,000 |
| Result: underpayment | tentative amount due $45,000 | −$22,000 * | Result: |

* The parties have agreed that the workers' compensation insurer has no claim on any proceeds in this case.

25. The three-column calculations are set out below:

| General Damages | Underinsured Motorist (Sauve) | Settling W/C Insurer Austin/Grubb) | Insured (Wilson) |
|---|---|---|---|
| Share of general damages | $81,000 | $54,000 | $135,000 |
| Credits | $50,000 | no credits | $50,000 |
| Result: underpayment | tentative amount due $31,000 | $54,000 | Result: amount that can be received without double recovery $85,000 |

elements are considered in the aggregate.[26]

The question is whether subsection .445(b) requires that damages be separated into their component parts when determining whether there is a double recovery. A leading text, Larson's Workers' Compensation Law, has examined the general question of double recoveries and advocates considering damages in the aggregate:

> The legislative purpose of helping the injured person is subject, however, to one crucial limitation: there must not be double recovery. The problem thus narrows down to the question of what is meant by double recovery. "Double recovery" can mean two different things, and it is a failure to recognize this primary fact that accounts for much of the confusion that has been evident in this field. It can mean recovering from two sources a combined amount that is greater than the plaintiff's actual total damages. Or, it can mean getting recoveries from two sources, whether or not the aggregate amount equals or exceeds actual damages.[27]

After discussing the two types of double recovery, Larson's concludes that the aggregate approach is clearly preferable on policy grounds:

> We are now ready to ask: is the second sort of double recovery obnoxious to the policies of compensation acts or uninsured motorist acts, or to public policy in general? The question almost answers itself. There can be no conceivable policy objection to allowing an injured person to retain two recoveries that, when combined, still do not make him or her whole.[28]

■ We agree with Larson's policy judgment and believe that an insured's damages should be considered in the aggregate under subsection .445(b) unless there are compelling reasons to do otherwise.

State Farm argues that considering damages separately is required by AS 09.17.040(a). This statute provides:

> (a) In every case where damages for personal injury are awarded by the court or jury, the verdict shall be itemized between economic loss and noneconomic loss, if any, as follows:
>
> (1) past economic loss;
>
> (2) past noneconomic loss;
>
> (3) future economic loss;
>
> (4) future noneconomic loss; and
>
> (5) punitive damages.

But State Farm does not connect the requirement of itemization in AS 09.17.040(a) with its contention that damages may not be treated in the aggregate under subsection .445(b).

We do not think that a connection exists. The itemization required by AS 09.17.040(a) is primarily designed to ensure that future losses are identified so that they can be reduced to present value. Reduction to present value is the subject of subsections (b) and (c) of .040. Another reason to itemize is apparent from subsections (d) through (g). These subsections are concerned with providing for the payment of future damages, at the option of an injured party, through periodic payments. These purposes bear little or no relationship to the anti-duplicate recovery purpose of .445(b).

The purpose of .445(b) would not be furthered by making separate calculations for each component of damages. This is especially true when the general purposes of the 1990 reforms to Alaska's UIM law are considered. Adopting the separate component method advocated by State Farm would amount to a partial reintroduction of the reduction method that the legislature intended to replace with the excess approach. The objective of the excess approach, as we have seen, was to maximize UIM coverage, reduc-

---

**26.** Of course, if the $50,000 paid by Sauve's insurance were split between lost wages and general damages, the amount payable to Wilson could be different, depending on the particular allocation.

**27.** 6 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 110.05[8], at 110–23 (2008).

**28.** *Id.*

ing policy limits only as necessary to avoid a double recovery.[29] State Farm's method would result in greater reductions than necessary to achieve this goal. As we indicated in *Victor,* where the underlying purpose of a provision is to prevent double recoveries, a method that achieves no more than that is to be preferred to one that cuts more deeply into an insured's recovery.[30]

For the reasons stated, the judgment of the superior court is AFFIRMED.

---

29.  *See supra* pp. 584–86.

30.  *See supra* p. 585.